UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ANDREW ARNOLD,                           :
                        Plaintiff,       :
                                         :
            -v-                          :        09 Civ. 7932 (DLC)
                                         :
BETH ABRAHAM HEALTH SERVICES, INC. YONI  :        OPINION & ORDER
KONO, MAUREEN CONNOLLY, KERI FRAZIER-    :
WHITE,                                   :
                        Defendants.      :
                                         :
---------------------------------------- X

APPEARANCES:

For Plaintiff:
Andrew Arnold, pro se
1964 Nereid Avenue
Bronx, NY 10466

For Defendants:
Terri L. Chase
Emilie A. Hendee
Jones Day
222 East 41st Street
New York, NY 100017

DENISE COTE, District Judge:

    Andrew Arnold filed this employment discrimination action

against his former employer Beth Abraham Health Services ("Beth

Abraham") and others.  The defendants have moved for summary

judgment on the one remaining claim in which Arnold asserts that

he was fired in violation of the Jury System Improvements Act of

1978, 28 U.S.C. § 1875 (the "Act").  For the reasons that

follow, the motion for summary judgment is granted.

BACKGROUND

Beth Abraham is a non-profit organization located in the Bronx that provides residential and community-based health care services for adults.  It includes a program of all-inclusive care for the elderly called Comprehensive Care Management ("CCM") in which physicians, nurses, social workers and others work together to address the needs of the patients and residents.

During Arnold's employment at Beth Abraham it had a written policy allowing employees to take time off for jury duty but requiring them to inform Beth Abraham "immediately" upon receipt of the jury duty notice.  Under the Collective Bargaining Agreement between the organization and the employees' union, employees on jury duty receive their regular pay.

Arnold has not identified any employee other than himself against whom Beth Abraham discriminated because of jury duty. In 2007, 147 employees took jury duty leaves of absence.

Beth Abraham hired Arnold in October 1997 to work as a temporary Authorization Specialist in the CCM program.  On February 10, 1998, it hired him as a full-time Authorization Specialist.  As an Authorization Specialist, Arnold's main duty was to input information obtained from doctors, nurses and others into a single, electronically-stored document called a

2

care plan, using a computerized system called CHAMP.  State regulations and the organization's policies provided timeframes for entry of the data.  Meetings were held regularly to discuss and assess each patient's care plan, and to evaluate a patient's treatment and progress.  Authorization Specialists attended these meetings.

During his employment at Beth Abraham, Arnold was counseled repeatedly regarding his performance.  Each time that he was given a written warning, Beth Abraham managers met with him to discuss the warning.  Among the written descriptions of his poor performance in maintaining records are the following.  In his 2003 performance evaluation, Arnold was advised that he needed to follow the care plan submission policies and procedures.  On May 13, 2004, he was warned about his failure to enter care plans in the CHAMP system or entering them as much as two months' late.  His 2004 evaluation noted that he needed to increase productivity and decrease errors in care plans.  It added, "Arnold will continue to improve workplace area & decrease clutter."  Arnold's 2005 evaluation noted that he needed to decrease his error rate when making entries on a care plan and to decrease workplace clutter "everyday by clearing the day[']s work off his desk."

In 2006, Beth Abraham's warnings to Arnold became even more pointed.  On March 22, 2006, Arnold was advised in writing that he needed to input interim orders on a daily basis.  On June 7, Arnold was warned regarding his failure to properly process care plans and other failures.  He was warned in writing that unless there was sustained improvement in his work, he would be disciplined or fired.  Arnold's 2006 Performance Evaluation noted that he "continues to disregard the process for printing and submitting careplans to participants' medical records . . . . He will not follow the established routine for generating careplans."  It added that he needed to maintain "an organized and orderly work area to facilitate the established workflows of CCMC."

On February 21, 2007, Beth Abraham issued a "final" written warning to Arnold.  It read in pertinent part,

> On or about October 11, 2006, a plan of correction was discussed and agreed upon by you, your manager and the [Union] delegates.  Despite numerous weekly meetings and discussion between yourself, managers, and delegates -- you have failed to show any significant improvement in the following areas:
>
> 1. Review and tracking of care plan in Care Plan Tracking Log
> 2. Discharging of medication from medication profile
> 3. Timely completion and filing of care plans
> 4. Maintaining an organized work space.

It advised him that without "immediate and sustained improvement in all of the areas listed" he would be fired.

At some point in 2007, Arnold received a notice to appear in federal court on Monday, April 2, 2007, for jury duty. Arnold advised his supervisor of the jury duty notice at approximately 3:30 p.m. on Friday, March 30, the last work day before he was scheduled to begin his jury service.  Arnold's supervisor Yoni Kono ("Kono") had responsibility to ensure that Arnold's work was done in his absence.  Kono went to Arnold's work space on Monday, April 2, and discovered, in her words, a desk "in complete disarray."  She could not determine which medication and interim orders had been input into the CHAMP system and which had not.  She became concerned that the information in the documents on Arnold's desk had not been input into the system and that that omission could jeopardize patients' treatment plans.  Kono immediately contacted the Director of Human Resources ("Director") and recommended that Arnold be fired.  When Arnold returned to work on April 5, the Director informed him that he was being fired for unsatisfactory job performance and gave him a termination letter.

Following the termination of his employment, Arnold alleged at various times that he was fired because of his gender and age, as well as due to discrimination based on his jury service. Arnold took leaves of absence for jury duty in 1999, 2003, 2005 and 2007.  He does not claim that he was disciplined in any way

for the first three leaves.  He does claim through this action, however, that Beth Abraham fired him because of his jury service in 2007.


PROCEDURAL HISTORY

The procedural background to this case has already been described in an Opinion of May 27, 2010, Arnold v. Beth Abraham Health Servs., Inc., No. 09 Civ. 7932 (DLC), 2010 WL 2179956 (S.D.N.Y. May 27, 2010) (the "May 27 Opinion"), which is incorporated by reference.  Litigation concerning Beth Abraham's firing of Arnold has been ongoing in various fora since Arnold's employment ended on April 5, 2007.  On or about August 6, 2009, Arnold filed this action.  Following the close of discovery, the defendants filed a motion for summary judgment.  The motion became fully submitted on February 4.


DISCUSSION

Summary judgment is "appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."  Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, 628 F.3d 46, (2d Cir. 2010) (citation omitted).  "The role of the court in deciding a motion for summary judgment is not to

resolve disputed issues of fact but to assess whether there are
any factual issues to be tried, while resolving ambiguities and
drawing reasonable inferences against the moving party." Wilson
v. Northwestern Mut. Ins. Co., 625 F.3d 54, 59-60 (2d Cir. 2010)
(citation omitted).

    The Act states that "[n]o employer shall discharge . . .
any permanent employee by reason of such employee's jury
service, or the attendance or scheduled attendance in connection
with such service, in any court of the United States." 28
U.S.C. § 1875 (emphasis supplied).  While there is little case
law interpreting the Act, in Gross v. FBL Financial Services,
Inc., 129 S. Ct. 2343 (2009), the Supreme Court considered a
similarly worded provision of the Age Discrimination in
Employment Act ("ADEA").[1]  That statute provides, in relevant
part, that it is "unlawful for an employer . . . to discharge
any individual or otherwise discriminate against any individual
with respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's age." 29
U.S.C. § 623 (2006) (emphasis supplied).  The Court held that

---

[1] Title VII, by contrast, provides that "an unlawful employment
practice is established when the complaining party demonstrates
that race, color, religion, sex, or national origin was a
motivating factor for any employment practice, even though other
factors also motivated the practice." 42 U.S.C. § 2000e-2(m)
(emphasis supplied).

since the term "because of" means "by reason of," in order to "establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." <u>Gross</u>, 125 S. Ct. at 2350.  In other words, "the claim cannot succeed unless the employee's protected trait actually played a role in the employer's decisionmaking process <u>and had a determinative influence on the outcome</u>." <u>Id</u>. (citation omitted).

ADEA claims, like other employment discrimination claims, are analyzed under the burden-shifting framework set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Gorzynski v. Jetblue Airways Corp.</u>, 596 F.3d 93, 106 (2d Cir. 2010).  Pursuant to <u>McDonnell Douglas</u>, the plaintiff bears the initial burden of establishing a <u>prima facie</u> case of discrimination, which requires showing:  (1) that plaintiff was within the protected group; (2) that the plaintiff was "qualified for the position"; (3) that the plaintiff "experienced adverse employment action"; and, (4) "that such action occurred under circumstances giving rise to an inference of discrimination." <u>Gorzynski</u>, 596 F.3d at 107.

If the plaintiff succeeds in making a prima facie case,

    the burden shifts to the defendant to articulate
    'some legitimate, nondiscriminatory reason' for its
    action.  Once such a reason is provided, the
    plaintiff can no longer rely on the prima facie case,

8

but may still prevail if she can show that the
employer's determination was in fact the result of
discrimination.

Id. at 106 (citation omitted).  Thus, "a plaintiff bringing a

disparate-treatment claim pursuant to the ADEA must prove, by a

preponderance of the evidence, that age was the 'but-for' cause

of the challenged adverse employment action and not just a

contributing motivating factor."  Id. (citation omitted).  The

structure for analyzing a claim under the ADEA will be applied

to Arnold's claim that the defendants violated the Act.

Arnold has failed to provide evidence to support a prima

facie case of discrimination based on his jury service.  There

is no dispute that Arnold received a notice of jury service,

that he was absent from work due to that service, and that he

was fired as soon as he returned to work.  Arnold has failed to

offer sufficient evidence, however, from which a jury could

infer that he was fired because of his jury service.

Arnold has offered no evidence that he was treated less

favorably than any other employee with his record of formal

warnings about job performance, that there was a pattern or

practice of intentional discrimination against employees who

perform jury service, or that anyone at Beth Abraham made any

invidious comments about jury service or about Arnold's jury

service.  To suggest that his jury service was the reason for

9

the termination of his employment he relies on the single fact
that he was fired while on jury service.

A plaintiff can ordinarily benefit from a presumption of
causation based on temporal proximity.  Thus, a "plaintiff can
indirectly establish a causal connection to support a
discrimination . . . claim by showing that the protected
activity was closely followed in time by the adverse employment
action."  Id. at 110 (citation omitted).  In this case, however,
that inference is insufficient to allow Arnold to carry even his
de minimis burden of showing prima facie evidence of
discrimination.

First, there is a substantial and undisputed record of the
warnings given to Arnold about his failure to record data
necessary to the creation and management of a care plan,
including the issuance of a final warning just six weeks before
he was fired.  Second, it is undisputed that the creation of an
accurate and timely care record was vital to the health of the
patients.  Third, it is undisputed that Kono made her decision
to seek the termination of Arnold's employment as soon as she
saw that disarray on his desk and realized its implications for
the safety of the patients.  Finally, while Arnold's impending
absence from work caused Kono to visit his desk, Arnold has
offered no evidence that the reason for that absence, that is,

10

his jury service as opposed to any other reason, had any impact on Kono's decision.

Even if it is assumed that Arnold has met his <u>prima facie</u> burden of showing a retaliatory firing, he has not carried his burden of showing intentional discrimination due to his jury service.  Beth Abraham has offered an entirely legitimate reason for its decision to terminate Arnold's employment.  It has offered evidence of written warnings about poor performance that spanned years, culminating in a "final" written warning to Arnold just weeks before it fired him.  It has also shown that the specific problems with Arnold's performance, which are described in those warnings and which Kono saw on the day she recommended the termination of his employment, impacted in a material and direct way the quality of care provided to patients.

In opposition to summary judgment, Arnold has principally raised the following issues.[2]  Arnold first contends that Beth Abraham would leave the work of an Authorization Specialist "unattended" until the employee returned.  At other points in his opposition, however, Arnold directly contradicts this assertion by acknowledging the importance of inputting

_____

[2] This Opinion only addresses those arguments raised by Arnold which are relevant to the analysis of the summary judgment motion.

prescriptions and other patient information accurately and promptly into the computerized system.  Indeed, he asserts that it was his practice to enter the relevant data and that he had done so before leaving for jury duty.  Therefore, considering Arnold's presentation in opposition to the summary judgment as a whole, he does not dispute that Beth Abraham was required to and had the practice of insuring that all care records were complete and accurate in the event an Authorization Specialist was absent from work.

Arnold next takes issue with Beth Abraham's description of the quality of his work performance.  Arnold describes some positive passages in his performance reviews for the years 2004 and earlier.  He contends that he was given greater responsibility than other Authorization Specialists over the years due to his seniority and expertise.  Thus, as of 2007, his caseload consisted of 250 patients, instead of the average of 200 patients.  Arnold contends that his error rate for entering medication orders into the computer system was "the lowest" of all Authorization Specialists and that he had completed all of his care plans during the period before he was fired.

None of these assertions by Arnold raises a question of fact regarding the history of warnings that had been issued to him over the years, which are described above.  Nor does Arnold

12

dispute that a final written warning was issued to him just
weeks before he was fired.  Moreover, Arnold has not disputed
that among the several problems with his performance that were
described in these warnings were his failure to promptly record
patient information in the care plans.

As for his last day at work, Arnold asserts that there were
no medication and no interim orders left behind on his desk "to
be inputted" when he left work on March 30.  Arnold acknowledges
that there were documents on his desk, but claims that he had
grouped and rubber-banded "discarded" patient information into
shredding piles if he had not placed it into the shredding box
before leaving work.  He contends that he told Kono before
leaving work that all of his care plans had been completed,
which indicated that there was no backlog of information left to
be inputted into the computer.

Arnold also observes that any "unfinished interim orders
could be returned to a communal bin" to be completed by other
Authorization Specialists, and that each Authorization
Specialist "devised their own method of differentiating the
uncompleted (batches) pile of papers from the completed pile,
headed to the shredding bin."  Arnold also explains that Kono
could have determined that he had no backlog of work remaining
to be done.  By using each individual patient's identification

13

number to locate the patient's social security number, Kono could have accessed the patient's computerized file to confirm "which documents on Plaintiff's desk, amongst those grouped into working piles . . . were to be shredded and which, if any were to be entered into the CHAMP system."  Consequently, Arnold concludes that Kono had "no need [to] 'panic' at the presence of discarded hard copy information organized into working piles destined next for shredding."

Arnold's explanation regarding the paperwork left on his desk on March 30 and his description of the steps Kono could have taken to determine which, if any, papers needed to be entered by an Authorization Specialist does not raise a question of fact preventing entry of summary judgment. "[C]ourts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process" when determining "whether an employee's performance meets his employer's legitimate expectations." Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985) (citation omitted).

While Arnold appears to take issue with an assertion that the papers on his desk were in disarray, he does not dispute that he left piles of paperwork on his desk with no labels identifying what information had been entered into care plans and what documents were ready for shredding.  He does not

14

explain why he had not simply placed the documents that needed
to be shredded into the shredding bin.  Assuming for purposes of
this motion that Arnold had advised Kono that he had completed
all of his work, Kono had a duty as his supervisor to confirm
that that had been done.  This was particularly necessary given
the long, documented history of Arnold's performance
deficiencies, the final warning he had recently been given, the
importance of prompt and accurate entry of the information to
the patients' health care, and the late notice Arnold gave her
of his jury duty.  Thus, whether Arnold had or had not properly
entered all of the information into the database before he left,
Kono was confronted with an emergency.  There were piles of
paperwork and no easy way to determine what remained to be done.
A Beth Abraham employee could have confirmed whether all of the
information had been entered into the care plans for the
patients, but that confirmation process was a time-consuming and
laborious task.

    In sum, nothing in Arnold's presentation suggests that Beth
Abraham's stated reason for firing Arnold was pretextual.  It
has offered undisputed evidence that it determined that the
state of Arnold's desk after he left work on March 30 entitled
it to fire him and was the reason it fired him.  Arnold had been
given repeated warnings about his failure to properly input

patient information, and had been given a "final" warning just a few weeks before.  Arnold admits that, despite these warnings, he left piles of paperwork on his desk with no clear indication of what work remained to be entered into the computer system. Arnold has failed to offer evidence which would permit a jury to find that his jury service played a role in the decision to fire him and had a determinative influence on that decision.  See Gross, 129 S. Ct. at 2350.

Arnold next asserts that he told Kono on March 30 that he had received his jury duty notice "before" that date, but denies saying to her that he had received it "weeks before" that date. He adds that he explained to Kono that he was handing in the jury notice late because of an "oversight".  This disagreement about the precise words Arnold used in advising Kono about his jury service does not raise a dispute regarding any material fact.  Arnold admits implicitly, as he must, that he had received the notice weeks earlier.  He acknowledges that he did not inform his employer until Friday afternoon that he would be absent the following Monday to perform jury service.  Therefore, the relevant and undisputed facts, for purposes of this motion, are that Arnold gave extremely late notice of his jury service and that his untimely notice allowed insufficient time for Arnold and his supervisor to prepare together for his departure.

16

Finally, Arnold argues that his late delivery of notice of his jury service must have prompted Beth Abraham to fire him since Beth Abraham had been willing until that time to allow him to reschedule some missed vacation days.  The parties are in agreement that Beth Abraham had made no decision to fire Arnold until March 30.  Beth Abraham explains that the state of Arnold's desk following his departure from work that day prompted it to act on the final warning notice that it had recently given Arnold.  As described above, there is no material dispute that Arnold left piles of paper on his desk with no written indication whether the data in these papers had already been entered in the patients' care plans.  As a consequence, the fact that Beth Abraham had until that time allowed Arnold to reschedule vacation days does not make Beth Abraham's explanation for its decision to fire Arnold either more or less likely.

In sum, Arnold's claim of retaliatory firing for participation in jury service rests entirely on one inference. He reasons that his jury service must have precipitated his firing because he was notified that he was fired as soon as he returned from jury service.  On this record, and in the absence of any other evidence that jury service prompted this adverse

employment action, however, Beth Abraham is entitled to summary judgment.

Arnold does not dispute the essential facts Beth Abraham has offered to explain its decision to terminate Arnold's employment.  He does not contest the authenticity of the many written warnings he received concerning his performance or the fact that he had recently received a final warning in writing. He does not contest that many papers were left on his desk with no clear indication of what paperwork had been entered into the system and what remained to be done.  He does not and could not contest that accurate and prompt entry of relevant data into the care record for each patient was of vital importance.  In these circumstances, whether Arnold left work because he had scheduled medical leave, to go on vacation, or to attend jury service was beside the point.  Without any evidence other than timing to suggest that jury service was even a motivating factor, let alone a but-for cause, in Beth Abraham's decision to fire Arnold, no reasonable juror could find in Arnold's favor at trial.

CONCLUSION

The defendants' December 17, 2010 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendants and close this case.

SO ORDERED:

Dated:    New York, New York
          June 15, 2011

_____
                    DENISE COTE
          United States District Judge

19